UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

BRIANNA O. ROSAS,                              :

                              :     Case No.:  1:26-cv-76 (AMN/PJE)

                    Plaintiff,        :

                              :     **COMPLAINT**

                              :

          -against-             :     **JURY TRIAL DEMANDED**

                              :

KEITH S. RINALDI, P.C., RINALDI TAX INC. &     :
KEITH S. RINALDI,              :

                              :

                    Defendants.       :

---------------------------------------------------------------- X

     The Plaintiff, BRIANNA O. ROSAS (hereinafter "Plaintiff"), as and for her Complaint against the Defendants, KEITH S. RINALDI, P.C., RINALDI TAX INC. & KEITH S. RINALDI (hereinafter "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

     Plaintiff BRIANNA O. ROSAS brings this action to remedy egregious violations of federal and state law involving appalling wage theft, failure to pay wages and sexual harassment. Specifically, Plaintiff seeks relief for: (1) violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., for failure to pay minimum wages, overtime compensation, and retaliation; (2) violations of Articles 6 and 19 of the New York Labor Law for failure to pay wages, overtime, and spread of hours compensation; (3) violations of New York Labor Law § 195 for failure to provide wage notices and statements; and (4) violations of the New York State Human Rights law for extreme and outrageous sexual harassment, sexual assault, verbal sexual harassment and quid pro quo sexual harassment.

## JURISDICTION AND VENUE

1.      Plaintiff brings this action under the Fair Labor Standards Act (hereinafter the "FLSA"), 29 U.S.C. §§ 201 et seq., Articles 6 and 19 of the New York Labor Law (hereinafter the "NYLL"), and the supporting New York State Department of Labor Regulations of the Official Compilation of Codes, Rules, and Regulations of the State of New York promulgated by the Commissioner of Labor pursuant to the Minimum Wage Act including Parts 142 and 146 of Title 12 (hereinafter "Regulations"), to recover unpaid minimum wages, unpaid regular wages, unpaid overtime compensation, unpaid spread of hours compensation, and for other relief.

2.      Jurisdiction over Plaintiff's federal claims is based upon 28 U.S.C. § 1331.

3.      The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) because these claims are so related to the federal claims that they form part of the same case or controversy.

4.      Venue is appropriate in the Northern District of New York pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this judicial District, including Plaintiff's employment and Defendants' failure to pay wages in Dutchess County.

## PARTIES

5.      Plaintiff is an adult individual who is a resident of Ulster County, New York.

6.      Plaintiff was employed by Defendants as a non-exempt, non-managerial employee from on or around mid-2020 through January 31, 2025. Plaintiff was employed as a personal assistant, housekeeper, chauffeur and business assistant working for all Defendants as directed daily by Keith S. Rinaldi.

7.      Plaintiff is a covered employee within the meaning of the FLSA and the NYLL.

2

8.      Defendant Keith S. Rinaldi, P.C. is a domestic business corporation duly organized and existing under and by virtue of the laws of the State of New York.

9.      Defendant Keith S. Rinaldi, P.C. maintains its principal place of business at Ten Arlington Avenue, Poughkeepsie, New York 12603.

10.     Defendant Keith S. Rinaldi, P.C. operates as a law practice providing legal services.

11.     Upon information and belief, Defendant Rinaldi Tax Inc. is a domestic business corporation duly organized and existing under and by virtue of the laws of the State of New York.

12.     Upon information and belief, Defendant Rinaldi Tax Inc. maintains its principal place of business at Ten Arlington Avenue, Poughkeepsie, New York 12603.

13.     Upon information and belief, Defendant Rinaldi Tax Inc. operates as a tax services business.

14.     Defendant Keith S. Rinaldi is an individual who is a resident of the State of New York and Dutchess County.

15.     At all relevant times, Defendant Keith S. Rinaldi was and still is an owner, corporate officer, director, and/or managing agent of Defendants Keith S. Rinaldi, P.C. and Rinaldi Tax Inc.

16.     At all relevant times, Defendant Keith S. Rinaldi exercised operational control over Defendants Keith S. Rinaldi, P.C. and Rinaldi Tax Inc., controlled significant business functions of said entities, determined employee salaries and pay rates, made hiring and firing decisions, and acted on behalf of and in the interest of Defendants Keith S. Rinaldi, P.C. and Rinaldi Tax Inc. in devising, directing, implementing, and supervising the wage and hour practices and policies relating to their employees, including Plaintiff.

17.     At all relevant times, Defendant Keith S. Rinaldi participated in running the daily operations of Defendants Keith S. Rinaldi, P.C. and Rinaldi Tax Inc.

18.     At all relevant times, Defendant Keith S. Rinaldi managed and supervised Plaintiff and her work for Defendants Keith S. Rinaldi, P.C. and Rinaldi Tax Inc.

19.     At all relevant times, Defendant Keith S. Rinaldi maintained control, oversight, and direction over Plaintiff, including but not limited to hiring, setting pay rates and schedules, controlling work assignments, supervising Plaintiff's work, timekeeping, payroll, and other payroll practices applied to her.

20.     At all relevant times, Defendants had substantial control over Plaintiff's working conditions and over the unlawful policies and practices applied to her.

21.     Defendants are covered employers within the meaning of the FLSA and the NYLL.

## FACTS

**The Employment Relationship**

22.     From in or around mid-2020 through on or about January 31, 2025, Plaintiff was employed by Defendants as a non-exempt, non-managerial employee.

23.     Plaintiff worked for Defendants as a business assistant, personal assistant, chauffeur, and housekeeper.

24.     Plaintiff's job duties included landscaping, gardening, pool and hot tub maintenance, cleaning, cooking, driving the employer, scheduling appointments, sending faxes, bank errands, running office errands, all shopping - personal, business - both online and in person, splitting and hauling wood, asphalt driveway repairs and maintenance, brush hogging land, and various other manual labor tasks.

25.     Plaintiff performed work at multiple locations including Defendant's law office in Poughkeepsie, New York, Defendant's home in the Town of Washington, Dutchess

County, New York, and various other commercial and residential properties owned by Defendant.

26.     At all relevant times, Defendant Keith S. Rinaldi hired Plaintiff, determined Plaintiff's rates of pay, decided the manner in which Plaintiff would be paid, set Plaintiff's work schedule, determined the number of days and hours Plaintiff worked each week, decided what job duties Plaintiff performed on a daily basis, and was responsible for the daily supervision of Plaintiff and her job duties.

27.     At all relevant times, Defendant Keith S. Rinaldi managed and controlled all aspects of Plaintiff's work for Defendants.

28.     During her employment with Defendants, Plaintiff never had any managerial duties.

29.     Plaintiff had no control or influence over personnel decisions.

30.     Plaintiff had no control or influence over the pay or schedule of other employees.

31.     Plaintiff had no control, authority, or influence related to Defendants' finances or operations in any way.

32.     At no point during her employment did Plaintiff perform any jobs or exercise any duties that would classify her as exempt from overtime under the FLSA or the NYLL.

33.     Throughout her employment, Plaintiff was undeniably an employee and Defendants were undeniably employers.

**Plaintiff begins work for the Defendants**

34.     Plaintiff was first introduced to Keith Rinaldi in mid-2020 by her brother who had been employed by Rinaldi at his home and businesses in Dutchess County doing maintenance work and manual labor.

35.    At that time, Plaintiff, a 29-year-old female, was looking for work as she had recently left her prior housekeeping job in Connecticut and was in need of employment, and jobs were hard to find as the Covid epidemic had created a loss of jobs, especially in the local area.

36.    Plaintiff was living with her boyfriend at the time, not employed at the time, and Rinaldi's home and offices were within thirty minutes of their apartment, so she was glad to find some work, even if temporary.

37.    Plaintiff had and still has a very small network of support. She is long estranged from her mother, her father was remarried and lived close to an hour away, and her brother, who has a family of his own, was her only other family.

38.    In mid-2020, Plaintiff's brother asked Plaintiff to meet him at Rinaldi's house as Rinaldi was in desperate need of cleaning services. Plaintiff agreed and Rinaldi, a practicing lawyer, then 68 years old, put her to work immediately asking her to clean the house.

39.    The residence needed desperate cleaning. After she spent a day cleaning and transforming one upstairs room, Rinaldi asked Plaintiff to come back the next day.

40.    This pattern continued day by day until it eventually became unspoken that Plaintiff would come back the next day without being asked.

41.    Plaintiff had no other form of financial income, Covid 19 had made working and living options much more difficult for the Plaintiff, and her home life was troubled as it centered around a relationship with a man who was not very reliable financially or otherwise due to his own personal and emotional issues at that time.

42.    During the months that followed Plaintiff first cleaning Rinaldi's house, Rinaldi started to assign Plaintiff different tasks in addition to cleaning his house.

43.     Rinaldi asked Plaintiff to drive him anywhere that he went including out to dinner seven (7) nights a week. Plaintiff witnessed Rinaldi drinking alcohol during the day on every day that Plaintiff worked and witnessed Rinaldi smoking marijuana, so he required a driver everywhere he went.  Plaintiff was given this task in her employment.

44.     Plaintiff also ran all of Rinaldi's errands and was the go-to between his law office staff and Rinaldi in terms of providing things back and forth.  Rinaldi only worked from home and his law office staff only worked in a physical office.

**Plaintiff's Fear of Rinaldi Begins**

45.     In or about mid – 2021, less than a year after Plaintiff started working for Rinaldi, an incident occurred between Rinaldi and Plaintiff's brother that serves as the first time Plaintiff remembers significantly fearing Rinaldi.

46.     At the time, Rinaldi represented Plaintiff's brother in a legal matter and Plaintiff became aware of a disagreement between Rinaldi and her brother which stemmed from Plaintiff's brother refusing to take an action that he told Rinaldi would constitute insurance fraud.  Plaintiff remembers Rinaldi turning angry and physically barreling out of the front door chasing her brother. He told Plaintiff's brother to leave the premises immediately and was hostile and enraged.

47.     As Plaintiff's brother was gathering his tools to leave, Rinaldi threatened to call the police if he did not leave immediately threatening that the police would listen to him since he was a local attorney. At that moment, Plaintiff feared Rinaldi would cause her brother financial or legal harm as she took Rinaldi's inference to mean that law enforcement would take any claims he made as the truth even if they were not.  At the time there was no basis for calling the police and that fact itself put fear in Plaintiff – both for her brother and herself.

48.     As time went on after that event, Rinaldi began to instill fear in Plaintiff at every opportunity, including making statements to let Plaintiff know he believed he was untouchable in terms of anyone believing he would do anything wrong because he was a lawyer, that he could evade consequences and, most importantly, showing Plaintiff that he would weaponize the law against anyone that did not do as he asked. Indeed, he sued Plaintiff's brother after the above-described incident.

49.     More important than the fact that Rinaldi sued Plaintiff's brother, is the coercion and threats of reputational, financial and criminal harm that Rinaldi openly made to Plaintiff's brother in writing that instilled deep fear of Rinaldi in the Plaintiff.

50.     In trying to collect roughly $3,000 for a personal auto loan after Plaintiff's brother, who was also Rinaldi's employee, Rinaldi used fear tactics, including his status as an attorney to cause Plaintiff's brother economic fear, reputational harm fear, and fear of criminal consequences. Rinaldi solidified his threats in writing to Plaintiff's brother[1], that if he did not pay the $3,000 he owed Rinaldi:

   a. repossession will rapidly occur and restraining **notices will rapidly go to anyone that we determine you are working for**, to your detriment…

   b. we are aware that you are working across Halls Corners Rd at Tom and Lou's property **whom I previously gave a glowing referral**…

   c. any untoward thing that occurs will **place you in the spotlight as the sole prime person of interest if not the sole suspec**t….

   d. I have thus far not retracted any written references for you I have given to the Family court- **Judge** Joseph A. Egitto, **Parole Office**r Michael Cifone, Melissa D. McGuire of **KeyBank**, and your **landlord** Art Janesec….but only you can prevent such, **which if retracted, will be blistering.** (emphasis added)

---

[1] The document quoted was filed by Rinaldi in the state law matter against Plaintiff's brother and the document remains on the docket in that matter.

51.    Rinaldi threatened legal and criminal consequences against his former employee manipulatively bringing up Rinaldi's employment relationship with Plaintiff and throwing in that he would tell two individuals to file orders of protection against Plaintiff's brother.

52.    There can be no question as to why Plaintiff feared Rinaldi.  Plaintiff was right to fear Rinaldi because as will be discussed herein, as soon as she left his employ, Rinaldi attempted to use the courts and his stature as an attorney against Plaintiff herself.

**Rinaldi's legal representation of the Plaintiff and her boyfriend is used to demand Plaintiff gratify Rinaldi's sexual needs**

53.    In July 2021, just prior to Rinaldi firing and suing Plaintiff's brother, Rinaldi convinced Plaintiff[2] and her boyfriend to file a lawsuit against Plaintiff's boyfriend's former employer. Rinaldi used this lawsuit, which Plaintiff's boyfriend was very much obsessed with succeeding on, to threaten Plaintiff by lording the work allegedly needed on the lawsuit over Plaintiff when he wanted anything from her.

54.    During 2022-2024 Rinaldi would demand Plaintiff give him massages while he lay naked under a sheet in his bed, telling Plaintiff that he would work on her boyfriend's lawsuit after Plaintiff did what he asked.

55.    Furthermore, also during 2022-2024 Rinaldi engaged in quid pro quo sexual harassment by delaying Plaintiff's paycheck if she refused to massage his naked body. This occurred nearly every day and Plaintiff dreaded going near Rinaldi. Rinaldi strung her paycheck and her boyfriend's lawsuit out as prizes Plaintiff had to win despite the fact that she worked hard for her pay.

---

[2] Plaintiff was removed from the lawsuit in mid-2022 approximately a year after it was filed by Rinaldi filing an amended complaint removing her from the caption and facts of the complaint.

56.    Rinaldi bragged to Plaintiff that his paralegal "J" gave him blowjobs under his desk at the office—saying once it was while meeting with a client. Rinaldi told Plaintiff this to further pressure Plaintiff into meeting his demands to be touched by Plaintiff.

**The sexual assault**

57.    During 2023 Rinaldi sexually assaulted the Plaintiff during the course of her employment.  Plaintiff was leaning over petting Rinaldi's cat and Rinaldi came up behind her and grabbed Plaintiff's hips and thrust himself into her over and over.

58.    During 2022-2024 Rinaldi would use his back scratcher to grab Plaintiff's butt and grab her vagina. Plaintiff was so degraded she was afraid to tell anyone.

59.    Rinaldi made Plaintiff feel bad about herself every time she had to touch him to get Rinaldi to pay her or provide legal assistance to her boyfriend.

60.    During 2022, with COVID restrictions starting to ease slightly and fear of Rinaldi and the working conditions growing worse, Plaintiff attempted to get another job and sought a reference from Rinaldi to help her find a live in caretaker position so that she could also have shelter since her financial and living situation was not healthy.

61.    When Plaintiff did not find a position, Defendant Rinaldi only increased demands upon Plaintiff realizing that Plaintiff felt "stuck" working for Rinaldi.

62.    Plaintiff's low self-esteem, which Rinaldi exploited, began to paralyze Plaintiff from trying to leave employment with Defendants.

63.    As that occurred, Rinaldi continually subjected Plaintiff to severe and persistent sexual harassment designed to exert emotional control over Plaintiff and maintain control over her labor, including countless times slapping Plaintiff's buttocks and commenting "how tight it is" and

stating that Plaintiff's "cunt must be able to squeeze a cock and not let go".  This conduct occurred regularly between 2022-2024

64.     During the same time frame, Rinaldi referred to Plaintiff regularly as "PJ" which he told her stood for "pussy juice".

65.     Also during 2022-2024 Rinaldi repeatedly told Plaintiff he would "love to grease her crease."

66.     This verbal sexual abuse by Rinaldi made Plaintiff feel weak and powerless. Furthermore, the actual things Rinaldi said were so outrageous and taboo to Plaintiff that they served to cause Plaintiff severe embarrassment and fear of telling anyone. Plaintiff lived with shame and embarrassment because she continued to work for Defendants despite the emotional abuse and sexual harassment by Rinaldi.

67.     During the same time period, Rinaldi offered Plaintiff $500.00 to have sex with him, treating her as a prostitute rather than an employee.  Plaintiff refused but Rinaldi kept asking.

68.     At the end of October or beginning of November 2020, Rinaldi asked Plaintiff and a friend if he could pay them for a threesome.

69.     Throughout 2022-2024 Rinaldi referred to Plaintiff's breasts as "Big Yanks" and her buttocks as "nice spread".

70.     During this same time frame Rinaldi repeatedly asked Plaintiff to engage in sexual acts, including asking if he could "suck on your [her] tits" and asking her to "shave my[his] pubic hairs and balls".

71.     During 2022-2024, Rinaldi, attempting to exert power and dominance over his employee, masturbated countless times in front of Plaintiff at his dining room table where he worked on legal matters asking Plaintiff to "watch or do it for me".

72.    Moreover, during this same time, Rinaldi would call Plaintiff to the upstairs of the house while sitting on the toilet with the bathroom door wide open trying to have a conversation with Plaintiff knowingly and intentionally making Plaintiff physically and emotionally uncomfortable.

73.    During all of Plaintiff's employment Rinaldi would walk around the house naked in front of Plaintiff.  He enjoyed making Plaintiff uncomfortable.

74.    Rinaldi also engaged in sexually explicit discussions with Plaintiff, repeatedly during 2021-2024 telling her a story of his roommate at Fordham who would heat up quarters then tell women at the gentlemen's club to use their vaginas to pick up burning hot quarters—which he thought was hilarious.

75.    During the same time frame, he also told stories about his roommate in Fordham, "JD", who Rinaldi alleged had sex with hookers with his amputee stump.

76.    He also repeatedly told Plaintiff about the "glass plate treatment" which he described as where a woman would defecate on a transparent glass plate for the pleasure of an onlooker.

77.    These conversations were so outrageous and offensive that they would make Plaintiff fearful of telling anyone else. Rinaldi knew this and would mock Plaintiff and laugh. Plaintiff now feared sexual and financial harm from Rinaldi if she tried to leave his employ.

78.    Throughout Plaintiff's employment Rinaldi would also say other things to embarrass Plaintiff and undermine her self-worth. For example, if he thought Plaintiff was menstruating, he would bring it up while she worked.  He would call Plaintiff "Blood Mary" and repeatedly tell Plaintiff a disgusting sexual story about his law school days and a night when he had sex with a female student named Mary who was menstruating and he returned to his room

with his white underwear covered in blood for all to see "the massacre". Plaintiff was too embarrassed to even repeat this to anyone.

79.    In mid-2020, Rinaldi made Plaintiff buy him porn DVDs.

80.    In or about January or February 2021, Rinaldi had Plaintiff purchase him a smart tv so he could watch porn on the internet in his bedroom. Rinaldi is technologically challenged so he would make Plaintiff put the porn on the tv for him. Rinaldi would start masturbating as Plaintiff was leaving and invited Plaintiff to stay and watch.

81.    Because Rinaldi frequently became drunk and enraged after drinking champagne and alcohol all day (Plaintiff often was required to bring him his drinks) screaming at Plaintiff about random things, Plaintiff would often flee the house out of fear and leave for a period of time.

82.    Not wanting to divulge all the details of what was occurring at work to her significant other as she feared the embarrassment and outrage that would come from that, Plaintiff would go back and return to work for Rinaldi within a few days.

83.    Rinaldi often treated Plaintiff abusively and like she was inhuman. In July 2023, Plaintiff suffered a high-energy tibial plateau fracture (broken leg) while working at Defendant Rinaldi's home office. Despite this serious injury, Plaintiff continued working without time off and Rinaldi mocked her - requiring her on one leg to plant 900 sunflower seeds for Defendant Rinaldi's daughter's wedding.

84.    In or about early 2024, at approximately the same time that Rinaldi settled Plaintiff's boyfriend's lawsuit, Plaintiff was involved in a motor vehicle accident where her car was rendered a total loss.  As a result, Plaintiff did not have the ability to travel to and from work at Rinaldi's home or business.

85.     Preying on Plaintiff's situation, Rinaldi offered Plaintiff a car to use to get to work and back.  Plaintiff's boyfriend was troubled by it and offered to pay Rinaldi something for the use of the car, but Rinaldi told Plaintiff, "No, no, I insist, you are my friend and I want to help you" creating Plaintiff's dependence upon him.

86.     Shortly thereafter, Rinaldi, who paid Plaintiff "off the books" by cash or check, started to unlawfully deduct car rental charges from Plaintiff's wages for the use of his car.

87.     Plaintiff and Rinaldi had never discussed such charges, and she was surprised by it. There was no verbal or written agreement that would have provided for his authority to deduct money from her wages. When Plaintiff questioned Rinaldi, he became aggressive and belligerent.

88.     Plaintiff's boyfriend was outraged about what Rinaldi was doing after Rinaldi specifically had stated he did not want to negotiate a rent for the car.  He told Plaintiff to leave Rinaldi's employment because of this wage theft.

89.     Plaintiff left Rinaldi's employment at that time intending not to return.  Her hope was that her boyfriend's lawsuit settlement would help them move on with their lives and all the experiences with Rinaldi would be behind her.

**Rinaldi's Manipulation of Plaintiff's Domestic Crisis**

90.     In September 2024, three months after Plaintiff last worked for Rinaldi, Plaintiff's boyfriend left their shared apartment and was gone for weeks.  When he returned to the apartment, he and Plaintiff became involved in an argument, and neighbors called the police.

91.     Plaintiff did not press charges and her boyfriend left as a result of the police being called.  However, only her boyfriend's name was on the lease even though Plaintiff had lived there with him the entire time and all of the things in the apartment were hers, including her dogs.

92.     Two days later the police appeared at the apartment and presented Plaintiff with an order of protection her boyfriend had obtained in family court and told Plaintiff she had to leave the premises immediately since the apartment was legally her boyfriend's apartment.

93.     Plaintiff was unable to leave as she had nowhere to go, and she had two dogs that would have to leave with her. As Plaintiff tried to figure out what to do, the officers told her she had to leave immediately, but she could not.  As a result, at the same time that the police presented her with the order of protection, they violated her on the order of protection for not leaving the apartment.  Plaintiff was arrested and later that day was released after her brother appeared and arranged bail.

94.     Plaintiff had nowhere to turn and was fearful of how to handle this legal matter.  A day later Plaintiff called Rinaldi's support staff at the office for help asking what she should do.

95.     As a result of her call, Rinaldi called Plaintiff and told her he would be out that evening, but to stay at his house that night so they could talk the next morning about what she should do before she had to return to court.  Rinaldi also told Plaintiff that if she stayed with him, she could take his car to court the next morning as Plaintiff still did not have a vehicle.

96.     When they spoke the next morning, Rinaldi told Plaintiff that she could return to work for him and live in the basement of his house so she could work as much as she possibly could and save up money and be able to get her own place and get her feet on the ground.

97.     Plaintiff's brother and his family were unable to take her in, and her father's house was for sale as he was planning a move to Florida. Fearful of becoming homeless with two animals, Plaintiff stayed with Rinaldi and returned to work.

98.     Rinaldi soon started to tell Plaintiff, "You should be fucking me for staying at my house and "No other man would allow you to live with them unless you were fucking them."

99.    Plaintiff's boyfriend tried to have the order of protection vacated and continued to contact Plaintiff – often bringing her food or items to Rinaldi's house.

100.    Plaintiff kept busy working, and she tried to avoid Rinaldi's personal conversations and focus on resolving the legal matter and saving money.

101.    However, Rinaldi did not pay her after that first week. He made excuses and told Plaintiff that he would pay her soon or that he was too busy.

102.    Weeks went by with Plaintiff working without pay. However, Rinaldi had failed to pay her timely in the past and Plaintiff was always paid eventually, so having nowhere to turn, she kept working.

103.    During this period, Plaintiff was forced into extreme financial desperation.  Plaintiff could only eat once a day and it was dollar general shelf food or a slice of pizza. While working without pay she could not afford the minimum amount of food needed to remain healthy. She often felt extremely emotional and depressed as a result of this.

104.    Plaintiff was living off the small amount of remaining insurance money she received from car damage and had only $1000.00 to spend on all necessities during the unpaid work period which lasted for eighteen weeks.

105.    For example, Plaintiff was unable to purchase tampons during her menstrual cycle due to the financial desperation created by Defendants' wage withholding.

106.    Rinaldi's failure to pay her and Plaintiff's financial and emotional status became the chains that bound Plaintiff to Rinaldi's employ.

107.    After many weeks of Plaintiff not being paid, Rinaldi started to use familiar tactics.

108.    Rinaldi would tell Plaintiff that if she jumped a certain hoop he put up, she would get paid.  He would promise to talk about it later or in a few days. Plaintiff was trapped. In her

emotional condition, combined by her physical deterioration, Plaintiff believed that if she left, she would never get the money she was owed so she could not leave.

109.    Rinaldi would mock Plaintiff in his often-drunken state. Afraid she would not be believed about her working conditions; Plaintiff recorded Rinaldi while she was working in January 2025.

110.    Plaintiff recorded Rinaldi making racist and sexually explicit comments in a contrived Jamaican accent (this was a common way he spoke inside the house) to document the degrading and psychologically abusive environment she was forced to work. The recording documents Rinaldi stating:

> She probably has a bush, mon. She would push push on
>
> you and you'd take it. As long as she made you feel good,
>
> mon. Scissor shit mon, you broads are crazy. The boys do
>
> that, mon. You watch and see, mon. The nigs are gonna be
>
> sprung, mon ... cuz trump ... wait till you see ... he says the
>
> niggers made me win and suck nig dick mon.

111.    This audio documents just one instance of the degrading language Defendant used as part of the psychological coercion scheme designed to dehumanize and control Plaintiff.

112.    Shortly thereafter, in mid-late January 2025, still failing to pay Plaintiff, Rinaldi asked Plaintiff to contact her boyfriend[3] to look at his car. Rinaldi wanted him to come to the home and give Rinaldi an estimate for work, which was done. Rinaldi was also aware that Plaintiff's boyfriend was bringing her food and mail during this time frame.

---

[3] Plaintiff's boyfriend had done tractor repairs, maintenance and auto work on Rinaldi's cars in the past before the September order of protection.

113.    On January 31, 2025, Plaintiff asked Rinaldi to have a discussion with her about her owed pay, now 18 weeks of pay for which she had not been paid.  Plaintiff had documented her work hours every week since she had returned to Rinaldi's employ on September 19, 2024.

114.    When Rinaldi finally spoke to Plaintiff on January 31, 2025, Plaintiff handed him her September hours and asked if he could at least pay her for September even if she had to wait for the rest. Rinaldi responded that he would get to it when he could and laughed.  He then went out for the evening.

**The Retaliation for Demanding Wages Owed**

115.    That same evening, January 31, 2025, an ice storm occurred, and Plaintiff's boyfriend came to Rinaldi's to bring Plaintiff food[4]. Since Rinaldi lived at the top of a hill and the storm was bad, Plaintiff's boyfriend spent the night and planned to de-ice the driveway in the morning so they could get out.

116.    The next morning, Plaintiff was in the basement and could hear yelling.  As Plaintiff started upstairs, Rinaldi came downstairs screaming, "where is he" looking for Plaintiff's boyfriend. Plaintiff tried to calm down Rinaldi, but his response was, "I'm calling the cops."

117.    Plaintiff then heard Rinaldi call the police stating, "This is Keith Rinaldi, I'm a local attorney…."  He went on to tell the person on the phone that there was a "girl" at his house who was violating an order or protection.

118.    When the police appeared, Plaintiff's boyfriend explained that the family court order of protection was lifted and that Plaintiff had not contacted him, that he came to the house to see her, and that he had been at the house with Rinaldi's permission.

---

[4] The family court order of protection had already been lifted but Plaintiff was going through the process of defending the violation that she was charged with at the same time she was served with the OP.  The violation had to be handled in criminal court, not family court.

119.    It was not Plaintiff's boyfriend demanding that she be arrested, it was Rinaldi. Rinaldi told the police that he was aware that she was violating the criminal order of protection that was not yet resolved.  Plaintiff told the police that Rinaldi wanted her to be arrested because she was an employee he had stopped paying and she was demanding he pay her. She explained that the night before, they discussed pay and Rinaldi was mad. She was arrested because of Rinaldi's call.

120.    Plaintiff was released the same day and was told by the police that she could return to Rinaldi's because she had been living there and all her possessions and her dogs were there.

121.    Plaintiff returned to Rinaldi's house and was trying to access the back entrance when Rinaldi saw her and let her in. Plaintiff went to the basement and stayed there. She did not return upstairs; she did not make contact with Rinaldi. She hid in the basement as she needed to return to Court on February 25, 2025, to resolve the outstanding violation so she could be done with the matter.

122.    Several days after Plaintiff arrived back at the house, Rinaldi came to the basement and told Plaintiff that they could "talk about money tomorrow" and leaned over and hugged her.

123.    Plaintiff spent that day outside shoveling snow for Rinaldi. The next day she did the same. But when she asked Rinaldi about his promise to talk to her about back wages, he snapped at her.  He then refused to speak to Plaintiff about her owed wages again.

124.    Days later Plaintiff appeared in Court at what she believed was the last appearance related to the order of protection.  However, when she arrived and appeared before the judge with her public defender attorney, she could see a letter on Rinaldi's letterhead in front of the judge. This matter did not in any way relate to Rinaldi.  Plaintiff was shocked and petrified as she knew what Rinaldi was capable of.

125.    Plaintiff spoke to her appointed defense attorney who told her that Rinaldi had contacted the Court. She did not have specifics, but she wanted to adjourn the appearance to look into what was going on.

126.    Plaintiff later learned that Rinaldi contacted the court on February 25, 2025, March 25, 2025, and April 22, 2025, each time telling the Court lies about the Plaintiff and asking the court to issue him an order of protection.

127.    Rinaldi faxed letters to the Court over and over. He never filed a motion or filed a lawsuit. Instead, he wrote a campaign of letters to the judge trying to cause Plaintiff harm in a matter that did not in any way relate to him. Rinaldi was clearly and unequivocally retaliating against Plaintiff for demanding he pay Plaintiff owed wages.  Rinaldi was using the legal system as an avenue to try and cause Plaintiff harm.

128.    From January 31, 2025, through at least April 22, 2025, Rinaldi repeatedly violated the anti-retaliation laws of the FLSA and the NYLL.

129.    Plaintiff was made to suffer extreme fear and emotional distress at the hands of Rinaldi's action.

**Plaintiff's Wages Owed Under the FLSA and the NYLL**

130.    Plaintiff kept records of her hours worked during her employment with Rinaldi.

131.    Plaintiff produced her time records to Rinaldi and Rinaldi's law firm staff repeatedly.

132.    During this eighteen (18) week period, from September 20, 2024, through January 31, 2025, Plaintiff worked seven (7) days per week.

133.    From September 20, 2024, through January 31, 2025, Plaintiff worked a total of approximately one-thousand one-hundred seventy (1,170) hours, as detailed below.

134.    Throughout this eighteen (18) week period, Defendants failed to pay Plaintiff any wages whatsoever for the work she performed.

135.    To date, Plaintiff has received no compensation for the work she performed during this period. Defendant also failed to pay Plaintiff overtime for hours worked in excess of forty (40) per week.

**Wages owed for the period of September 2024**

136.    From September 20, 2024, through September 30, 2024, Plaintiff worked a total of 86.75 hours for Defendants.

137.    During this time period, Plaintiff's schedule varied from day to day as dictated by Defendants.

138.    On multiple days during this period, Plaintiff worked shifts in excess of ten (10) hours, including September 23 (12.5 hours) and September 29 (11.5 hours).

139.    During this time, Defendants did not pay Plaintiff spread of hours compensation or one additional hour of pay at the statutory basic minimum hourly rate for any of the workdays that Plaintiff worked in excess of ten (10) hours. Defendant also failed to pay Plaintiff overtime for hours worked in excess of forty (40) per week.

**Wages owed for the period of October 2024**

140.    During October 2024, Plaintiff worked a total of 270 hours for Defendants.

141.    During this time period, Plaintiff's schedule varied from day to day as dictated by Defendants.

142.    On multiple days during this period, Plaintiff worked shifts in excess of ten (10) hours, including October 4 (10.5 hours), October 11 (11 hours), October 18 (12 hours), October 21 (11.5 hours), October 23 (10.5 hours), October 24 (10.75 hours), October 25 (13.5 hours), and October 30 (11.5 hours).

143.    During this time, Defendants did not pay Plaintiff spread of hours compensation or one additional hour of pay at the statutory basic minimum hourly rate for any of the workdays that Plaintiff worked in excess of ten (10) hours. Defendant also failed to pay Plaintiff overtime for hours worked in excess of forty (40) per week.

**Wages owed for the period of November 2024**

144.    During November 2024, Plaintiff worked a total of 238.25 hours for Defendants.

145.    During this time period, Plaintiff's schedule varied from day to day as dictated by Defendants.

146.    On multiple days during this period, Plaintiff worked shifts in excess of ten (10) hours, including November 2 (11 hours), November 4 (10.5 hours), November 7 (10.5 hours), November 22 (12 hours), November 26 (12 hours), November 27 (15 hours).

147.    During this time, Defendants did not pay Plaintiff spread of hours compensation or one additional hour of pay at the statutory basic minimum hourly rate for any of the workdays that Plaintiff worked in excess of ten (10) hours. Defendant also failed to pay Plaintiff overtime for hours worked in excess of forty (40) per week.

**Wages owed for the period of December 2024**

148.    During December 2024, Plaintiff worked a total of 305.5 hours for Defendants.

149.    During this time period, Plaintiff's schedule varied from day to day as dictated by Defendants.

150.    On multiple days during this period, Plaintiff worked shifts in excess of ten (10) hours, including December 3 (13.5 hours), December 4 (11 hours), December 6 (11.5 hours), December 9 (12 hours), December 10 (11 hours), December 12 (11 hours), December 13 (10.5

hours), December 19 (12.5 hours), December 20 (11.5 hours), December 25 (11.5 hours), December 26 (11 hours), December 27 (12 hours), and December 28 (10.5 hours).

151.    During this time, Defendants did not pay Plaintiff spread of hours compensation or one additional hour of pay at the statutory basic minimum hourly rate for any of the workdays that Plaintiff worked in excess of ten (10) hours. Defendant also failed to pay Plaintiff overtime for hours worked in excess of forty (40) per week.

**Wages owed for the period of January 2025**

152.    During January 2025, from January 1, 2025, through January 31, 2025, Plaintiff worked a total of 269.5 hours for Defendants.

153.    During this time period, Plaintiff's schedule varied from day to day as dictated by Defendants.

154.    On multiple days during this period, Plaintiff worked shifts in excess of ten (10) hours, including January 2 (11 hours), January 5 (11.5 hours), January 9 (13.5 hours), January 17 (10.5 hours), January 21 (10 hours), January 24 (10.5 hours), and January 31 (13.5 hours).

155.    During this time, Defendants did not pay Plaintiff spread of hours compensation or one additional hour of pay at the statutory basic minimum hourly rate for any of the workdays that Plaintiff worked in excess of ten (10) hours. Defendant also failed to pay Plaintiff overtime for hours worked in excess of forty (40) per week.

**Record-Keeping and Payment Violations**

156.    Throughout Plaintiff's employment, Defendants paid Plaintiff "off the books" using personal checks rather than through formal payroll.

157.    Defendants never provided September 20, 2024, through January 31, 2025, period.

158.    Defendants failed to provide Plaintiff with a wage notice at the time of her hiring as required by NYLL § 195(1).

159.    Throughout Plaintiff's employment, Defendants failed to furnish her with a wage notice as required by NYLL § 195(1).

160.    Throughout Plaintiff's employment, Defendants failed to furnish Plaintiff with accurate wage statements along with every payment of wages Plaintiff with pay stubs or wage statements documenting her hours worked or wages paid.

161.    Defendants failed to maintain accurate records of Plaintiff's hours worked.

162.    Plaintiff maintained her own detailed daily time records showing the specific hours she worked each day during the as required by NYLL § 195(3).

**Defendants' Willful Conduct**

163.    Defendant Keith S. Rinaldi is a practicing attorney licensed in the State of New York and has been practicing law for over forty years.

164.    As an attorney, Defendant Keith S. Rinaldi knew or should have known of his obligations under the FLSA and NYLL to pay employees for all hours worked, to pay overtime compensation, to maintain accurate records, and to provide wage notices and statements.

165.    When Plaintiff requested payment for her work in September 2024, Defendant Keith S. Rinaldi became angry and refused to discuss payment.

166.    Throughout the unpaid period and thereafter, Defendants repeatedly made excuses and engaged in delay tactics to avoid paying Plaintiff for her work.

167.    Defendants had the financial ability to pay Plaintiff for her work performed.

168.    Defendants paid other employees for their work without issue during the same time period when Plaintiff was not being paid.

169.    Defendants' failures to pay proper wages and maintain required records have been made without good faith, willfully, and with a reckless disregard for Plaintiff's rights, and Plaintiff has been damaged by such failures.

170.    Throughout the relevant period, Defendants knew or should have known that their failure to pay Plaintiff her wages violated the FLSA and NYLL.

171.    Throughout the relevant period, Defendants knew or should have known that their failure to pay Plaintiff overtime compensation violated the FLSA and NYLL.

172.    Throughout the relevant period, Defendants knew or should have known that their failure to maintain proper records violated the FLSA and NYLL.

173.    Throughout the relevant period, Defendants knew or should have known that their failure to provide proper wage notices and statements violated the NYLL.

174.    Defendants' violations of the FLSA and NYLL have been willful, deliberate, and intentional, and not the result of any good faith belief that their conduct was in compliance with the law.

**Unlawful Evasion of Payment post end of employment**

175.    Once out of Defendant's home, Plaintiff tried through letter, text and email to have her owed wages paid through Rinaldi's daughter and law firm staff.

176.    Throughout February, March, and April of 2025, Defendants repeatedly made excuses to avoid paying Plaintiff, including claiming they needed more detailed information about her work, citing the ongoing criminal investigations (which is clearly a violation of the law in NYS as withholding wages is not permitted under any circumstances), and stating they could not comment on the matter.

177.    On March 20, 2025, Defendants, through Defendant Keith S. Rinaldi's daughter, informed Plaintiff that her matter could not be resolved until conclusion of "several ongoing criminal investigations that are related to Keith's personal and business finances as well as damage to his property." Again, this was both retaliatory and a violation of New York State Labor law which provides Article 6 of the New York Labor Law, the State's wage theft statute, sets forth various requirements relating to the payment of wages. Among other things, the statute prohibits employers from unlawfully withholding wages from employees employed in the State.

178.    On March 31, 2025, Defendants stated "Due to ongoing criminal investigation, we cannot, and will not, comment" in response to Plaintiff's continued requests for payment.

179.    Defendants' refusal to pay Plaintiff any wages after her September 2024 wage complaint,

coupled with their campaign of excuses and threats, constituted adverse actions taken in retaliation for Plaintiff's protected activity of requesting her lawfully earned wages.

180.    Defendants' retaliatory actions were carried out with a reckless disregard for Plaintiff's rights under the FLSA and the NYLL.

181.    As a result of Defendants' retaliatory actions, Plaintiff was caused to suffer significant damages, including but not limited to financial hardship, inability to purchase basic necessities, inability to secure housing and transportation, and severe emotional distress.

## COUNT I - VIOLATION OF THE FAIR LABOR STANDARDS ACT
## FAILURE TO PAY MINIMUM WAGES AND OVERTIME

182.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

183.    Defendants are "employers" within the meaning of the FLSA, and Plaintiff was an "employee" entitled to FLSA protections.

184.    From September 20, 2024, through January 31, 2025, Plaintiff worked 1,170 hours for Defendants, regularly exceeding 40 hours per week, but received zero compensation.

185.    Defendants' failure to pay any wages violated 29 U.S.C. § 206(a) (minimum wage) and § 207(a)(1) (overtime compensation).

186.    Defendants' violations were willful, and Plaintiff is entitled to unpaid wages, overtime compensation, liquidated damages, attorneys' fees, and costs pursuant to 29 U.S.C. § 216(b).

### COUNT II - VIOLATION OF THE NEW YORK LABOR LAW
### FAILURE TO PAY WAGES, OVERTIME, AND SPREAD OF HOURS

187.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

188.    Defendants violated the NYLL by failing to pay minimum wages, overtime compensation for hours exceeding 40 per week, and spread of hours compensation for workdays exceeding 10 hours.

189.    Defendants' willful failure to pay any wages for 1,170 hours violated NYLL Articles 6 and 19.

190.    Plaintiff is entitled to unpaid wages, overtime compensation, spread of hours compensation, liquidated damages, attorneys' fees, and costs.

### COUNT III - VIOLATION OF THE NEW YORK LABOR LAW § 195
### FAILURE TO PROVIDE WAGE NOTICES AND STATEMENTS

191.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

192.     Defendants willfully failed to provide wage notices as required by NYLL § 195(1) and wage statements as required by NYLL § 195(3).

193.     Plaintiff is entitled to statutory penalties of $5,000.00 for each violation, plus attorneys' fees and costs.

## COUNT IV - RETALIATION UNDER THE FLSA AND THE NYLL

194.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

195.     Plaintiff engaged in protected activity by requesting payment for her lawfully earned wages in September 2024.

196.     Following Plaintiff's protected complaint, Defendants retaliated by withholding all wages for the entire 18-week period, calling police to have her removed, pursuing false criminal charges for six months, and engaging in a systematic campaign of threats and intimidation.

197.     Plaintiff is entitled to compensatory damages, punitive damages, lost wages, liquidated damages, attorneys' fees, and costs.

## COUNT V - SEXUAL HARASSMENT UNDER NEW YORK STATE HUMAN RIGHTS LAW
### N.Y. Executive Law § 296

198.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

199.     At all relevant times, Defendants were "employers" within the meaning of N.Y. Executive Law § 296, employing four or more persons.

200.     At all relevant times, Plaintiff was an "employee" within the meaning of N.Y. Executive Law § 296.

201.    Throughout Plaintiff's employment, Defendant KEITH S. RINALDI subjected Plaintiff to severe and pervasive sexual harassment based on her sex, creating an abusive and hostile work environment.

202.    Defendant's sexual harassment included, but was not limited to:

    a.   "Countless times slapping [Plaintiff's] buttocks and commenting how tight it is" and stating that Plaintiff's "cunt must be able to squeeze a cock and not let go";

    b.   Offering Plaintiff "$500 to have sex with him," treating her as a prostitute rather than an employee;

    c.   Repeatedly asking Plaintiff to perform sexual acts, including asking her if he "suck on your [her] tits" and to "shave my [his] pubic hairs and balls";

    d.   "Masturbated countless times at dining room table asking Plaintiff to watch or do it for him"; and

    e.   Defendant engaged in sexually explicit discussions with Plaintiff, When Defendant suspected Plaintiff was menstruating, he would call her "Bloody Mary," referencing a degrading story from his law school days to humiliate Plaintiff about natural bodily functions.

203.    The harassment was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create an abusive working environment that a reasonable person would find hostile and abusive.

204.    Defendants knew of the harassment, as it was perpetrated by the principal owner and operator of the business, yet failed to take any prompt or appropriate corrective action to remedy the hostile work environment.

205.    Defendant's conduct was motivated by Plaintiff's sex and would not have occurred but for Plaintiff's gender.

206.    As a direct and proximate result of Defendants' sexual harassment, Plaintiff suffered and continues to suffer severe emotional distress, humiliation, anxiety, depression, and other compensable injuries.

207.    Defendants' conduct was willful, wanton, and malicious, warranting an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants for:

A.  All minimum wages, regular wages, overtime compensation, and spread of hours compensation owed;

B.  Liquidated damages under the FLSA and NYLL;

C.  Statutory penalties of $10,000.00 for wage notice and statement violations;

D.  Compensatory damages, punitive damages, and lost wages for retaliation and sexual harassment;

E.  Reasonable attorneys' fees;

F.  Pre-judgment and post-judgment interest; and

G.  Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial.

Dated: January 15, 2026
      Albany, New York

                                      **HARDING MAZZOTTI, LLP**

By: *Kelly A. Magnuson*

                              Kelly A. Magnuson, Esq. (Bar No.: 519535)
                              *Attorneys for Plaintiff*
                              1 Wall Street
                              Albany, New York 12205
                              Tel.: (518) 556-3402
                              Email: Kelly.Magnuson@1800LAW1010.com